UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
CENTRAL ISLIP

| | |
|---|---|
| Agnita Cheah, individually and on behalf of all others similarly situated, | 2:22-cv-03633 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Pepperidge Farm, Incorporated, | Jury Trial Demanded |
| Defendant | |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1. Pepperidge Farm, Incorporated ("Defendant") manufactures, markets, labels and sells dark colored, mottled crackers identified as "Harvest Wheat" under the Pepperidge Farm brand ("Product").



2. The crackers contain specks of what appear to be grains and are displayed on a stone slap with freshly picked produce and cheese.

3. The representation as "Harvest Wheat" causes consumers to expect it contains a predominant amount of whole grains compared to refined grains.

## I. CONSUMERS VALUE WHOLE GRAINS

4. Consumers increasingly prefer whole grains to non-whole, or refined, grains.

5. Whole grains are nutritionally superior to non-whole grains because they include the entire grain seed, consisting of the endosperm, bran, and germ.

6. The bran and germ contain important nutrients like fiber, vitamins, minerals, and antioxidants, such as iron, zinc, folate, magnesium, thiamin, niacin, selenium, riboflavin, manganese, copper, vitamin A, and vitamin B6.

7. In contrast, "non-whole grains" or "refined grains" have been processed to remove the bran and germ, thereby removing the fiber and most other nutrients.

8. Most refined grains are enriched, a process that adds back some of the previously removed iron and B vitamins, such as thiamin, riboflavin, niacin, and folic acid.

9. Other nutrients, including fiber, vitamin E, vitamin B6, vitamin K, magnesium, manganese, potassium, phosphorus, copper, calcium, and selenium, are not added back.

10. Where flour is made of refined grains, which only contains the endosperm and mainly starch, it is white in color ("white flour").

## II. CONSUMERS EXPECT FIBER FROM PRODUCTS REPRESENTED AS WHOLE GRAIN

11. The 2015-2020 Dietary Guidelines for Americans recommend that at least half of all grains eaten be whole grains.

12. The Dietary Guidelines recommend consuming 48g of whole grains and 28g of fiber per day.

13. The Dietary Guidelines promote whole grains as an important source of fiber.

14. 87% of consumers try to consume more whole grains and 92% try to get more fiber.

15. Research proves that consumers seek whole grains because they want more fiber.

16. In surveys, more than 60% of consumers stated they want to consume more whole grains to improve their digestive health, which is reflective of a desire to increase fiber intake.

17. Almost 75% of consumers who are presented representations which contain express and implied representations that a product is made with, or contains whole grains, will expect that food to be at least a good source of fiber – 10% of the daily value.

18. Almost 70% of consumers agree with the statement that whole grains are one of the best sources of fiber.

19. 62% of consumers agree that foods made from whole grains are one of the best sources of fiber.

20. 46% of consumers rely on foods with whole grains for their daily fiber needs.

21. Based on the proven connection with fiber, consumers expect foods represented – directly or indirectly – as whole grain, do more than tell consumers a product contains a type of grain ingredient.

### III. CONSUMER CONFUSION ABOUT WHOLE GRAINS

22. Despite consumers' desire to consume more whole grains, a recent study in the journal, Public Health Nutrition, concluded that labeling practices stymie these efforts.

23. The study found that the most significant information considered by consumers in comparing foods with different amounts of whole grain was not the ingredient list or nutrition facts, but the front label.

24. When products used terms like "multigrain" or "wheat" on the front label, between thirty to fifty percent of participants believed these foods had more whole grains than products

without such names.

25. According to a food economist and professor at Tufts University, the words used on wheat products can cause consumers to be misled as to the relative amount of whole grains compared to refined grains.

26. For instance, products labeled "multigrain" and "Twelve Grain" by definition contain more than one type of grain.

27. However, consumers expect that besides regular refined grains, the primary grains in those products are whole grains.

28. Instead, they are mostly refined grains with a *de minimis* amount of whole grains.

29. Other potentially misleading terms include "stoned wheat" or "stoned ground grain."

30. These terms have no formal definition about how much whole grain they contain.

31. However, the word "stoned" implies a primitive form of processing, i.e., with stones.

32. This is in contrast to the advanced technology and machinery used to create refined grains, or white flour.

33. The result is that consumers expect grain products described and promoted with the word "stone[d]" to contain mostly whole grains, because they are presumed to be less processed than refined grains.

34. Another term which contributed to consumer misunderstanding about whole grains is "honey wheat."

35. The Public Health Nutrition study found that 43% of respondents believed at least half to all of the grains in a "honey wheat" product was whole grains.[1]

---

[1] Parke Wilde, et al. "Consumer confusion about wholegrain content and healthfulness in product labels: a discrete choice experiment and comprehension assessment." Public Health Nutrition 23.18 (2020): 3324-3331.

36. However, the amount of whole grains was negligible.

37. Consumers believed "honey wheat" was a type of wheat, and the term "honey" referred to its amber color, darker than regular wheat.

38. Where grains and wheat are described with the term "harvest," i.e., "harvest grain" and "harvest wheat," consumers expect a product which is mostly whole grains.

39. This is because the word "harvest" is defined and understood as "the process or period of gathering in crops."

40. By emphasizing the "harvest" in "harvest grain" and "harvest wheat," consumers expect that the wheat and grains they are consuming is closer in form to its original "harvest" state than after it is fully refined.

41. After all, all grains are initially harvested, but it is their subsequent refining – the removal of the bran and germ – that strips away the nutrients of harvested grains.

42. The public health advocacy group, Center for Science in the Public Interest ("CSPI"), noted that terms such as "harvest grain" was misleading to consumers, who expected it meant a product contained a predominant amount of whole grains.[2]

43. One food and nutrition professor stated, "Even people with advanced degrees cannot figure out how much whole grain" is in products represented to consumers as whole grain.

44. The FDA and Federal Trade Commission ("FTC") have cautioned companies against misleading consumers as to the relative amounts of whole grains in foods.

45. Both agencies – based on numerous studies and research – know that when consumers are presented with products that reference or allude to whole grains on the front label, consumers will expect those foods to get at least half of its grain content from whole grain.

---

[2] CSPI, Comments to 2006 FDA Draft Guidance on Whole Grain Labeling.

46. Most consumers, they found, will expect any references, direct or indirect, to whole grains, mean a food is 100% or entirely whole grain.

47. The FDA and FTC highlighted deceptive tactics such as the names used to identify grain ingredients, and added dark coloring, among other methods, that companies should steer clear of when marketing whole grain foods to consumers.

IV. PRODUCT NOT WHOLE GRAIN

48. Despite the labeling of the Product as "Harvest Wheat," with a dark brown color, and visible pieces of grain, the Product contains a negligible absolute and relative amount of whole grains compared to refined grains.

49. This is revealed in part from the fiber content shown on the Nutrition Facts as less than 1g per serving, or 4% of the Daily Value.



50. This is further confirmed by the ingredient list, which reveals that the most predominant ingredient is "ENRICHED WHEAT FLOUR."

6

MADE FROM: ENRICHED WHEAT FLOUR (FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE, RIBOFLAVIN, FOLIC ACID), VEGETABLE OILS (CANOLA, SUNFLOWER AND/OR SOYBEAN), BROWN SUGAR (SUGAR, INVERT SUGAR, MOLASSES), DEFATTED WHEAT GERM, WHOLE WHEAT FLOUR, SUGAR, CONTAINS 2% OR LESS OF: SALT, HONEY, OAT FIBER, MALTED BARLEY FLOUR, BAKING SODA, SOY LECITHIN, MONOCALCIUM PHOSPHATE, NONFAT MILK.

MADE FROM: ENRICHED WHEAT FLOUR (FLOUR, NIACIN, REDUCED IRON, THIAMINE MONONITRATE, RIBOFLAVIN, FOLIC ACID), VEGETABLE OILS (CANOLA, SUNFLOWER AND/OR SOYBEAN), BROWN SUGAR (SUGAR, INVERT SUGAR, MOLASSES), DEFATTED WHEAT GERM, WHOLE WHEAT FLOUR, SUGAR, CONTAINS 2% OR LESS OF: SALT, HONEY, OAT FIBER, MALTED BARLEY FLOUR, BAKING SODA, SOY LECITHIN, MONOCALCIUM PHOSPHATE, NONFAT MILK.

51. While the Product contains "WHOLE WHEAT FLOUR," this is listed fifth, just ahead of sugar.

52. There is no way for consumers to know what percent of the Product's grains are refined relative to whole grains.

## V. INGREDIENTS USED TO DARKEN COLOR GIVES APPEARANCE OF MORE WHOLE GRAINS

53. Studies have shown that consumers seeking whole grain look for products darker in color with visible grains.

54. One participant stated, "For me I like to look at the color," and "I like to be able to see the grains" to find out if a food is mainly whole grain.

55. In part, this is due to the presence of bran in whole grains, which gives it a distinctive brown coloring.

56. This is logical, because refined grains are associated with white flour, which is white and smooth.

57. The Product contains several ingredients which alter its physical appearance so that consumers will expect the "Harvest Wheat" crackers depicted on the label are predominantly whole grain.

58. First, though the primary sweetener is brown sugar, its component ingredients

7

correctly show this consists of regular sugar with molasses added back, to impart a darker color.

59. Second, the addition of honey causes bread, crackers, and other grain products to "[to] brown[s] easily during baking, adding a natural dark color," because it consists of "mostly reducing sugars."[3]

60. Third, the crackers are mottled with darker spots and specks, because it contains added defatted wheat germ.



61. Industry publications praise this ingredient as recognized to "help[s] manufacturers of wheat-based products cut down on costs" by using less whole grain and give consumers the impression a product contains more whole grain.

62. According to a November 2019 article in Food Business News, the tan to dark color of defatted wheat germ and its "granular particle size gives a wholesome appearance and texture to baked foods such as crackers, bread, tortillas, cookies and muffins."

63. Consumers viewing these brown specks will believe they are there because the Product is predominantly whole grain and/or contains a non-de minimis amount of whole grain, when this would be false.

---

[3] W.K. Nip et al., eds. *Bakery products: science and technology*, Ch. 7, "Sweeteners," John Wiley & Sons, 2006.

8

64. The addition of molasses, honey, and defatted wheat germ results in a darker product which consumers believe has more whole grains relative to refined grains than it does.

65. The Product's color and texture would be significantly lighter and smoother if based solely on the ratio of refined grains to whole grains.

## VI. CONCLUSION

66. Defendant makes other representations and omissions with respect to the Product which are false and misleading.

67. Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

68. The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

69. Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

70. Had Plaintiff known the truth, she would not have bought the Product or would have paid less for it.

71. As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $4.09 for 10.25 oz, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

72.

## Jurisdiction and Venue

73. Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C.

§ 1332(d)(2).

74. The aggregate amount in controversy exceeds $5 million, including sales, statutory and punitive damages, injunctive relief, and attorney's fees, exclusive of interest and costs.

75. The Product is sold at thousands of locations in the states covered by the classes Plaintiff seeks to represent.

76. Plaintiff Agnita Cheah is a citizen of New York.

77. Defendant Pepperidge Farm, Incorporated is a Delaware corporation with a principal place of business in Norwalk, Fairfield County, Connecticut.

78. The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

79. The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold with the representations described here for several years, in thousands of locations, in the states covered by Plaintiff's proposed classes.

80. The Product is available to consumers from grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and online.

81. Venue is in the Central Islip in this District because a substantial part of the events or omissions giving rise to these claims occurred in Suffolk County, including Plaintiff's purchase, consumption, transactions and/or use of the Product and awareness and/or experiences of and with the issues described here.

Parties

82. Plaintiff Agnita Cheah is a citizen of Bay Shore, Suffolk County, New York.

83. Defendant Pepperidge Farm, Incorporated is a Delaware corporation with a principal place of business in Norwalk, Connecticut, Fairfield County.

595STPORT AVENUE, NORWALK, CT, 06851,

84. Defendant Pepperidge Farm, Incorporated is a Connecticut corporation with a principal place of business in Norwalk, Connecticut, Fairfield County and is a citizen of Connecticut.

85. In 1937, Margaret Rudkin started the company known today as Pepperidge Farms to prepare wholesome, nutritious foods that her son, who had asthma and was allergic to most commercially processed foods, could eat.

86. This commitment to nutrient dense yet widely accepted foods continues to be the hallmark of Pepperidge Farm.

87. Pepperidge Farm is believed to have opposed many "advances" in the food industry, such as the development of synthetic preservatives, artificial flavors, and significant amounts of additives and thickeners, like sugars and starches, because it stays as close to its founding principles as possible.

88. This commitment is apparent when it comes to whole and refined grains.

89. Early on, Pepperidge Farm recognized how modern wheat processing stripped away valuable nutrients and fiber and has been at the forefront of advocating for greater consumption of whole grains.

90. Pepperidge Farm's commitment to whole grains is shown through its logo of the actual grist mill in Sudbury, Massachusetts which for decades supplied only whole wheat flour.

91. The importance placed on whole grains by Pepperidge Farm is in contrast to other big food companies, who rely on low cost refined flours to churn out nutritionally deficient foods.

92. Based on these bedrock values, Pepperidge Farm became one of the largest food manufacturers in the United States.

93. Consumers trust Pepperidge Farm because they know its brand represents a commitment to nutrition and quality foods, like they might prepare for their own families.

94. Defendant spends millions of dollars each year on consumer research to identify attributes of products consumers want and will pay more for.

95. Defendant's internal and external studies confirm that consumers increasingly seek foods which contain a greater absolute and relative amount of whole grains compared to refined grains, and correspondingly sufficient amounts of fiber.

96. Plaintiff purchased the Product at locations including Stop & Shop Supermarket, 421 Commack Rd, Deer Park, NY 11729, between June 2021 and January 2022, among other times.

97. Plaintiff believed and expected the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did because that is what the representations and omissions said and implied, on the front label and the absence of any reference or statement elsewhere on the Product.

98. Plaintiff relied on the words, terms coloring, descriptions, layout, placement, packaging, hang tags, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

99. Plaintiff bought the Product at or exceeding the above-referenced price.

100. Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

101. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, instructions, features, and/or

components.

102. The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

103. Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

104. Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar whole grain products, because she is unsure whether those representations are truthful.

## Class Allegations

105. Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **New York Class:** All persons in the State of New York who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Kansas, New Hampshire, Nebraska, Virginia, South Carolina, Montana, Iowa, Mississippi, and Utah who purchased the Product during the statutes of limitations for each cause of action alleged.

106. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

107. Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

108. Plaintiff is an adequate representative because her interests do not conflict with other members.

109. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

110. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

111. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

112. Plaintiff seeks class-wide injunctive relief because the practices continue.

New York General Business Law ("GBL") §§ 349 & 350

(Consumer Protection Statute)

113. Plaintiff incorporates by reference all preceding paragraphs.

114. Plaintiff believed the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

115. Defendant's false, misleading and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

116. Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

117. Plaintiff relied on the representations and omissions to believe the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

118. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Violation of State Consumer Fraud Acts

(On Behalf of the Consumer Fraud Multi-State Class)

119. The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

120. Plaintiff and/or the members of the Consumer Fraud Multi-State Class reserve their rights to assert these consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

121. Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

122. As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

123. Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose
and Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

124. The Product was manufactured, identified, marketed and sold by Defendant and expressly and impliedly warranted to Plaintiff that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

125. Defendant directly marketed the Product to Plaintiff through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, product descriptions distributed to resellers, and targeted digital advertising.

126. Defendant knew the product attributes that potential customers like Plaintiff were

seeking and developed its marketing and labeling to directly meet those needs and desires.

127. Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

128. Defendant's representations affirmed and promised that the Product contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

129. Defendant described the Product so Plaintiff believed it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, which became part of the basis of the bargain that it would conform to its affirmations and promises.

130. Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

131. This duty is based on Defendant's outsized role in the market for this type of Product, a trusted brand known for the highest quality products.

132. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

133. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

134. Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

135. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

136. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

137. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

138. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

139. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

140. Defendant had a duty to truthfully represent the Product, which it breached.

141. This duty was non-delegable, based on Defendant's position, holding itself out as having special knowledge and experience in this area, a trusted brand known for the highest quality products.

142. Defendant's representations and omissions regarding the Product went beyond the specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

143. These promises were outside of the standard representations that other companies

may make in a standard arms-length, retail context.

144. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

145. Plaintiff reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

146. Plaintiff would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

### Fraud

147. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it contained a greater absolute and relative amount of whole grains compared to refined grains, and more fiber, than it did.

148. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

149. Defendant knew of the issues described here yet did not address them.

150. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

### Unjust Enrichment

151. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

18

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1. Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2. Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3. Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4. Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5. Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6. Other and further relief as the Court deems just and proper.

Dated:   June 20, 2022

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
Spencer Sheehan
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com